IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. THOMAS YAMASHITA, an individual; SUNBURST PLANT DISEASE CLINIC, INC., a California Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>WILBUR-ELLIS COMPANY, a California Corporation; HUGHSON CHEMICAL COMPANY, LLC, a California Limited Liability Company,<br><br>Defendants. | No. C 06-01690 WHA<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND DENYING WILBUR-ELLIS' MOTION FOR SANCTIONS** |

**INTRODUCTION**

In this patent-infringement action, plaintiffs Dr. Thomas Yamashita and Sunburst Plant Disease Clinic, Inc. move for a preliminary injunction and defendant Wilbur-Ellis cross-moves for sanctions. This order finds that plaintiffs have not satisfied any of the factors necessary for imposition of a preliminary injunction. This order, therefore, **DENIES** plaintiffs' motion. Wilbur-Ellis' motion for sanctions, however, is **DENIED**.

**STATEMENT**

Plant fertilizers are not new. "[T]hey have been around for hundreds of years, including the use of carbon-based fertilizers as exemplified by the use of organic matter such as humus

1  and manure in the 19th century. The ancient use included the addition of macronutrients,
2  including nitrogen and phosphorous" (Lovatt Decl. ¶ 10). "An early example is the classic
3  story of Squanto teaching the Pilgrims 'to heap the earth into low mounds with several seeds
4  and fish in each mound.' The decaying fish, a carbon/skeletal energy source rich in
5  macronutrients, as well as vitamins, fertilized the corn."

6  According to plaintiffs Dr. Yamashita and his company Sunburst, "[t]raditional plant
7  nutrition and fertilizer products to date have mostly been limited to supplying a plant with a
8  specific mineral or specific nutrient" (Compl. ¶ 14). In purported contrast, "Dr. Yamashita's
9  approach improves the application of nutrients and energy sources to plants by creating a more
10 perfect balance of nutrients and carbon energy source in consideration of the highly variable
11 factors affecting each specific plant or crop" (*Id.* at ¶ 15).

12 Dr. Yamashita is the holder of the three patents in suit, which described his
13 "technology" of "compensatory balanced nutrition." The parent patent, United States Patent
14 No. 5,549,729 ("the '729 patent"), was issued on August 27, 1996. Plaintiff subsequently
15 secured two continuations of the '729 patent, United States Patent No. 5,797,976 ("the '976
16 patent") and United States Patent No. 6,309,440 ("the '440 patent").

17 Plaintiffs' instant motion for a preliminary injunction focuses on two claims from the
18 '440 patent, issued October 30, 2001. That continuation patent has a remaining duration of two
19 years. The '440 patent described a "method and composition for promoting and controlling
20 growth of plants." Claim 1 of the '440 patent read (col. 45, lines 2–21):

21     1. An aqueous composition comprising:

22     (a) a carbon skeleton/energy component selected from the group
        consisting of mannose, lactose, dextrose, arythrose, fructose,
23      fucose, galactose, glucose, gulose, maltose, raffinose, ribose,
        ribulose, rutinose, saccharose, stachyose, trehalose, xylose,
24      xyluose, frucose-p, galactose-p, glucose-p, lactose-p, maltose-p,
        mannose-p, ribose-p, xylose-p, xyluose-p, deoxyribose, adonitol,
25      galactitol, glucitol, matitol, mannitol, mannitol-p, ribitol, sorbitol,
        sorbitol-p, xylitol and mixtures thereof;
26
27     (b) a macronutrient component comprising a water soluble
        nitrogen source and a water soluble phosphorouse source;
28
       (c) a vitamin/cofactor source,

2

> the carbon skeleton/energy component, the macronutrient component and vitamin/cofactor in relative amounts effective for stimulating the growth of plants.

Claim 2 of the '440 patent stated (col. 45, lines 22–24) (emphasis in original):

> 2. The composition according to claim **1** wherein said macronutrient component further comprises a water soluble potassium source and calcium source.

These claims thus required four elements: (1) a carbon skeleton/energy component, (2) a macronutrient component, (3) a vitamin/cofactor, and (4) a composition of the three preceding elements in relative amounts "effective for stimulation of plant growth."

The specification of the '440 patent provided examples of the ingredients, proportions, and process for obtaining a fertilizer with the above elements. For instance, in "Example 1" "[s]ugar beet molasses was used as stock material and source of energy and carbon skeleton" (col. 2, lines 65–66). The following "mixing instructions" were given (col. 3, line 60–col. 4, line 9):

> While under rapid mechanical or hydraulic agitation, water and two thirds of the total molasses volume are mixed. The amount of added water should represent approximately 15% of the molasses volume. Ingredients are then slowly metered into the batch in the following order:
>
> 1. Citric Acid
> 2. Katy-J Complexing Agent
> 3. Phosphoric Acid
> 4. Nitrogen
> 5. Potassium
> 6. Micronutrients (separately)
> 7. Vitamins and cofactors
> 8. Seaweed Extract
> 9. Xanthan gum

Sunburst has manufactured, marketed and sold fertilizers utilizing the methods described in the '440 patent from 1985 up to the present. From 1998–2002, defendant Hughson Chemical Company, LLC was one of several companies distributing Sunburst's product to farmers, primarily in the San Joaquin Valley of California. According to plaintiffs, Hughson's regional manager, Howard Barnett, approached Dr. Yamashita about securing a license to manufacture and sell the Sunburst fertilizer under Hughson's name in late 2002, apparently under a threat by Barnett to manufacture an identical product if Dr. Yamashita refused. When Dr. Yamashita

3

denied the request, Hughson apparently ended its relationship with Sunburst. Plaintiffs contend that shortly thereafter, Hughson began manufacturing and selling an identical composition, allegedly copied from plaintiffs' product. According to plaintiffs, Hughson produced two infringing products called "K-Source" and "Nutra Pak." Plaintiffs allege that Hughson's sales representatives instructed farmers how to combine the two products to create a formulation that amounted to an identical product to Sunburst's fertilizer. In October 2003, plaintiffs, through counsel, sent Hughson a cease-and-desist letter.

In 2004, defendant Wilbur-Ellis Company acquired Hughson, although the nature of this acquisition is unclear. At the initial hearing for the instant motion, Wilbur-Ellis' counsel emphasized that she does not represent Hughson and that Wilbur-Ellis merely acquired the *assets* of Hughson without acquiring Hughson itself. Put differently, Hughson is merely a shell unaffiliated with Wilbur-Ellis. Plaintiffs counter that Hughson's operations continue as a branch of Wilbur-Ellis. This order, however, need not resolve this question. The bottom line is that plaintiffs allege that Wilbur-Ellis (via whatever branch) continues to manufacture K-Source and Nutra Pak. Plaintiffs argue that Wilbur-Ellis has induced and continues to induce infringement by selling these two products together and instructing farmers how to combine them to create a product which infringes the '440 patent.

Plaintiffs filed suit on March 6, 2006, alleging infringement, unfair competition under California Business and Professions Code § 17200, intentional interference with contract, and intentional interference with prospective economic advantage. On March 14, plaintiffs brought the instant motion for a preliminary injunction. An order dated March 28, 2006 granted expedited discovery.

Plaintiffs argue that Wilbur-Ellis has recently ratcheted up its production of K-Source and Nutra Pak. Moreover, plaintiffs present results from recent forensic tests comparing the chemical composition of Sunburst's fertilizer to samples of the K-Source/Nutra Pak combination. The results ostensibly show chemical equivalence. Wilbur-Ellis disputes the viability of the samples used for plaintiffs' tests and the results thereof and provides testing of its own which contradicts plaintiffs' results. The parties also present competing botany and

agronomy experts to discuss the validity of the '440 patent and compare it with the prior art. Wilbur-Ellis has filed a cross-motion for sanctions.

## ANALYSIS

This order finds that plaintiffs have not satisfied the four factors for a preliminary injunction. Wilbur-Ellis, however, is not entitled to sanctions for plaintiffs' motion.

**1.    PRELIMINARY INJUNCTION.**

"A preliminary injunction is a 'drastic and extraordinary remedy that is not to be routinely granted.'" *National Steel Car, Ltd. v. Canadian P. Ry., Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004) (*quoting Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir.1993)). A patentee seeking a preliminary injunction must establish: "(1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). In order to demonstrate a reasonable likelihood of success, the patentee must show that it will likely prove infringement and that its patent will likely withstand the defendant's challenges to validity and enforceability.

**A.    LIKELIHOOD OF SUCCESS ON THE MERITS.**

Plaintiffs have not met their burden on the first factor of likelihood of success. They have not shown that its infringement claim will likely withstand Wilbur-Ellis' invalidity attack. While a defendant bears the ultimate burden of proving invalidity and unenforceability, on a preliminary-injunction motion the movants must show that the asserted invalidity challenge "lacks substantial merit." *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1366 (Fed. Cir. 2001). Plaintiffs "need not establish the validity of a patent beyond question. The patentee must, however, present a *clear case* supporting the validity of the patent in suit." *Amazon.com,* 239 F.3d at 1359 (emphasis added). In other words:

> . . . '[v]ulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial. The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself' at trial.

5

*National Steel Car*, 357 F.3d at 1335 (internal citation omitted).

Here, Wilbur-Ellis has presented a compelling argument that the '440 patent was anticipated by the prior art and is thus invalid. Defendants have shown that a patent issued years before the patents in suit which can reasonably be viewed as having described the same "technology." United States Patent No. 4, 383,845 ("the '845 patent"), issued in 1983, taught of "a foliar growth promoting mixture for increasing crop yield" (Lovatt Decl. ¶ 3). That earlier patent described a liquid seaweed extract which "provides substantially all of the known elements essential to the growth of plants." Accordingly, defense botany expert Dr. Carol J. Lovatt explained that every element of claims 1 and 2 of the '440 patent were disclosed nearly twenty years before in the '845 patent (*id*. at ¶¶ 4–5).

Of course, "[a] determination that a claim is invalid as being anticipated or lacking novelty under 35 U.S.C. § 102 requires a finding that 'each and every limitation is found either expressly or inherently in a single prior art reference.'" *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003).

Relying on this rule, plaintiffs counter that two related features of the '440 patent were missing from the '845 patent. Plaintiffs argue that the composition in Dr. Yamashita's patent is "entirely water soluble" and an "absorbable solution" while the '845 patent only contained "some water soluble elements" and that it did not describe an absorbable solution.

The prior art patent did contain one claim describing all liquid elements ('845 patent, col. 9, lines 28–48):

> 1. A foliar growth promoting mixture, including:
>
> (a) a liquid seaweed base mixture forming approximately 50.0% by weight of said foliar growth promoting mixture;
>
> (b) a fish emulsion mixture forming approximately 25.0% by weight of said foliar growth promoting mixture;
>
> (c) a liquid humus mixture forming a predetermined weight percentage within the approximate range of 5.0%-15.0% by weight of the said foliar growth promoting mixture, said liquid humus mixture being a combination of peat humus and aqueous solution of ammonia; and,
>
> (d) a water soluble nutrient mixture having a predetermined weight percentage within the approximate range of 10.0%-20.0%

6

>    of said foliar growth promoting mixture, said soluble nutrient
>    mixture from the group consisting of carbohydrates and enzymes.
>
>    2. The foliar growth promoting mixture as recited in claim 1
>    where said fish emulsion mixture is hydrolyzed.

Claim 1 of the '845 patent described a fertilizer containing all liquid elements except for the fish-emulsion mixture. Claim 2 of that patent, in turn, described an invention in which everything else about claim 1 stayed the same except that the fish-emulsion mixture was "hydrolyzed," suggesting that the patent contemplated a composition of all liquid ingredients.

At oral argument, plaintiffs' counsel explained that the liquid humus and the hydrolized fish-emulsion mixture were merely suspension liquids, rather than absorbable solutions. This difference, counsel argued, has a significant impact on how readily a plant can absorb the composition.

Wilbur-Ellis' counter-argument at the hearing was more persuasive. Wilbur-Ellis correctly emphasized that the '440 patent did not claim a composition that was "absorbable." Rather, the '440 patent only required that the composition be "effective for stimulating the growth of plants" (col. 45, lines 20–21). Likewise, the '440 patent did not actually claim an aqueous "solution." Instead, the patent described an aqueous "composition" (col. 45, line 2). Although Dr. Yamashita now makes a declaration to the contrary, there was nothing in the '440 patent clearly limiting the elements of the claims to non-suspension liquids. Nothing rules out the liquid humus and hydrolized fish-emulsion mixture described in the '845 patent as plausible components of an aqueous composition effective for stimulating the growth of plants. Where a prior art patent contains every limitation of the patent in suit, *either explicitly or inherently*, the later patent will be found invalid. *Oakley*, 316 F.3d at 1339.

The parties also dispute the extent to which the '845 patent was "considered" by the United States Patent and Trademark Office when it granted Dr. Yamashita's patents. Plaintiffs contend that they disclosed the earlier patent with their application, although they concede that the patent examiner made no reference to the '845 or its bearing on the patents in suit. Plaintiffs maintain that we must assume that the patent examiner did her job and analyzed the prior art, citing *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed. Cir. 1990) for this

proposition. Plaintiffs, however, do not provide any authority suggesting that simply because they disclosed the earlier patent in their application, that the later patent is immune from an attack of anticipation.

Of course, at this juncture in the litigation a final assessment of the validity of the patents in suit is not necessary. It is sufficient to say that the patents in suit are at least "vulnerable" to a challenge on invalidity grounds. *National Steel Car*, 357 F.3d at 1335.[1] This vulnerability prevents this order from delving into the merits of the competing forensic tests. This order also need not address whether Barnett's purported threats are attributable to Wilbur-Ellis and whether they show wilful infringement. Plaintiffs have not survived this threshold attack on validity for purposes of showing a likelihood of succeeding on the merits.

### B.    IRREPARABLE HARM.

Wilbur-Ellis' invalidity challenge is a sufficient ground to deny plaintiffs' motion. As an alternative ground for denial of plaintiffs' motion, however, this order finds that plaintiffs have not satisfied the remaining factors for a preliminary injunction of irreparable harm, balance of hardships and public interest. Plaintiffs at best have offered conclusory statements that their business has been harmed. They have not backed those conclusions up with sufficient data and facts to justify the extraordinary relief of a preliminary injunction.

Plaintiffs are not entitled to a presumption of irreparable harm where, as here, they have not demonstrated a likelihood of success on the merits. *See High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir.1995).

Plaintiffs contend that the irreparable harm they suffer is the "loss of business opportunity" and "loss of profits" from Wilbur-Ellis' sale of infringing goods. *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1232 (Fed. Cir. 1985). Plaintiffs argue that every day they are losing a foothold in the market for agricultural products in California. Plaintiffs contend

---

[1] Wilbur-Ellis also attacks the '440 patent on grounds that several key terms in that patent are ambiguous and thus fatally indefinite. An initial step of a validity analysis requires a court to construe the claims. *Oakley*, 316 F.3d at 1339. This order can reach the invalidity question by relying on plaintiffs' apparent contention that the words should all be given their plain meaning without giving a final decision as to the accuracy of this proposed claim construction. Needless to say, certain terms in the patent may need be construed at a later date and possibly will received narrowed constructions different from the proposed construction.

8

1  that this is exacerbated by the fact that they do not license their products to other companies.  If
2  other companies are able to use Dr. Yamashita's ideas, it is argued, plaintiffs are left unable to
3  compete.

4  These arguments, however, clash with Dr. Yamashita's sworn statements about the
5  growth of Sunburst during the very period which plaintiffs claim the infringing products have
6  been on the market.  According to Dr. Yamashita, his business was also "substantially impaired
7  by the events of September 11, 2001" (Yamshita Decl. ¶ 22).  "Nevertheless, during 2004 and
8  2005, we have continued to invest substantially in the business, *increasing manufacturing*
9  *capacity, purchasing heavy equipment and hiring additional employees*" (*ibid*.) (emphasis
10 added).  Dr. Yamshita adds "[a]fter many years, our products are just now gaining prominence
11 in the industry and our reputation has soared."

12 In contrast, the primary evidence that Wilbur-Ellis has been ramping up production of
13 the K-Source/Nutra Pak combination is the following (*id*. at ¶ 24):

> Within the past four weeks, I learned that defendants have
> dramatically increased their capacity to manufacture and sell even
> greater quantities of its infringing products, as is evidenced by the
> increasing number of large storage containers publicly viewable
> on their facilities.  Clearly defendants are gearing up to compete
> on a larger scale and preparing to go after even greater market
> share beyond those farmer customers they previously were able to
> switch to their infringing products.

At oral argument, plaintiffs' counsel retreated from this argument with respect to the large
containers, which a defense witness apparently testified were present for *over six years*.  Even
as to the proliferation of small containers supposedly viewed by Dr. Yamashita, increased
production of the K-Source/Nutra Pak combination is not the most plausible inference.  As
plaintiffs repeat many times, Wilbur-Ellis is a large corporation with numerous products.  These
storage containers could be used for any one of Wilbur-Ellis' products, not just for those
products purportedly infringing Dr. Yamshita's patents.

There is thus little except plaintiffs' desire to exclude Wilbur-Ellis from the market
underlying plaintiffs' claim of irreparable harm.  As the Federal Circuit noted:

> [I]f the right to exclude during the litigation period alone
> established irreparable harm, the presumption of irreparable harm
> stemming from a finding of likely success could never be

9

> rebutted, for every patentee whose motion for a preliminary injunction is denied loses the right to exclude an accused infringer from the market place pending the trial.

*Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1559 (Fed. Cir. 1994).

In addition, plaintiffs' delay in seeking the instant injunction weighs against a finding of irreparable harm. In certain limited circumstances, delay will rebut even a presumption of irreparable harm:

> The failure to bring suit against other potential infringers may be relevant to an analysis of irreparable harm, but only when it indicates unreasonable delay in bringing suit, willingness to accept royalty-type damages in lieu of market exclusivity, or indifference in enforcing one's patent.

*Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996).

Plaintiffs conduct here "indicates unreasonable delay in bringing suit." Plaintiffs admittedly have known since 2003 that Hughson Chemical (and eventually Wilbur-Ellis) were selling the purportedly infringing combination. Plaintiffs argue that the delay is justified because they needed to investigate the claims, because they were trying to informally resolve the situation, and because they lacked resources for protracted litigation due to capital expenditures during the time in question (Br. 21). Plaintiffs rely on *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988), for the proposition that lack of financial resources can justify delay. Plaintiffs also cite several district court opinions that have found various situations such as pending negotiations and infringement investigation to justify delays of up to two years. *See, e.g.*, *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1068 (N.D. Cal. 2000); *Henkel Corp. v. Coral, Inc.*, 754 F. Supp. 1280, 1309 (N.D. Ill. 1990).

Yet at most the cases plaintiffs cite stand for the fact that delay does not rule out a finding of irreparable harm as a matter of law. *See Hybritech*, 849 F.2d at 1457. The fact that plaintiffs took three years to institute this action is at least a persuasive consideration regardless of the purported justifications. The fact that plaintiffs lacked money to pursue litigation is dubious at best because they were ramping up expenditure in their business during the same time period. A company afraid of infringing competitors could be reasonably expected to eliminate infringement before going full boar into that very market. Likewise, although

10

plaintiffs claim they needed to do investigation, it does not seem that they have acquired any new evidence of infringement over the past years, except the errant and preposterous conclusion about Wilbur-Ellis' increased storage tanks. The results for plaintiffs' forensic tests were not obtained until *after* they initiated this lawsuit. Finally, it seems that plaintiffs' supposed negotiations with Wilbur-Ellis took the form of repeated demands to cease and desist. That is not the type of negotiation apt to bear fruit worth delaying litigation for three years.

Finally, it appears that plaintiffs have an adequate remedy in the form of monetary damages. Where monetary damages can compensate a plaintiff in the event of an ultimate finding of infringement, there is insufficient harm to justify a preliminary injunction. *Eli Lilly and Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed. Cir. 1996).

Plaintiffs counter that the loss in exclusivity for even one growing season will weaken their market share and reputation. Yet again, this is rebutted by the fact that Dr. Yamashita testified that plaintiffs' prominence in the market has been *increasing* during the time of the purported infringement. By this measure, if the alleged infringement continues and is ultimately proved by plaintiffs, they will be able to receive monetary compensation sufficient to compensate for any lost customers and still not suffer a loss in market share.

### C.    BALANCE OF HARDSHIPS.

Plaintiffs argue that the balance of hardships favors them because of the potential for disruption to their business. In contrast, according to plaintiffs, Wilbur-Ellis' business will not be threatened by a permanent injunction given that it "is a large, global company with numerous product lines" (Br. 23). Finally, plaintiffs point to authorities that suggest that the balance should tip especially in plaintiffs' favor given that the '440 patent is near the end of its term. *See Atlas Powder*, 111 F.2d at 1232; *S.C. Johnson, Inc. v. Carter-Wallace, Inc.*, Case No. 81 Civ. 1081, 1985 WL 501 (S.D.N.Y Mar. 29, 1985).

As noted, however, plaintiffs simply have not demonstrated that the purported infringement has been disruptive to their business. On the contrary, plaintiffs arguably suffered greater economic turmoil as a result of the September 11 terrorist attacks than as a result of the supposed infringement. According to Dr. Yamashita himself, plaintiffs' business has grown in

1  the midst of the infringement. The mere fact that Wilbur-Ellis is a large corporation that could
2  bear the loss of one of its numerous product lines does not mean that we must automatically
3  find the hardships tip in favor of plaintiffs.

### D. PUBLIC INTEREST.

Plaintiffs cite *Augat, Inc. v. John Mezzalingua Associates, Inc.*, 642 F. Supp. 506, 509 (N.D.N.Y. 1986), for the proposition that "[t]he public interest in a patent case is strongly weighted toward protecting the rights of patent holders." The Supreme Court, however, made clear long ago that "the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain." *Lear, Inc. v. Adkins*, 395 U.S. 653, 670 (1969). Accordingly, "although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech*, 849 F.2d at 1458.

Plaintiffs argue that there is "a strong public interest in protecting California's farmers, and ensuring that they are not receiving inferior products from infringers" (Reply Br. 15–16). Plaintiffs, however, also allege that the combination of K-Source and Nutra Pak "copies" the composition in Sunburst's fertilizers. It is thus difficult to see how California's farmers are being deceived if plaintiffs' allegations are true. On the contrary, the interest of the farmers seems better served by having access to competitive products, being able to determine which products better suit their needs, and receiving reduced prices due to the availability of competing products.[2]

### 2. SANCTIONS.

Wilbur-Ellis cross-moves for sanctions arguing that plaintiffs have been less than forthcoming in producing responsive discovery for purposes of the motion for a preliminary injunction. Wilbur-Ellis contends that plaintiffs have had documents responsive to Wilbur-

---

[2] Plaintiffs move to strike the declaration of Dr. Arnold J. Bloom. As this order does not rely on that declaration, this order need not rule on this evidentiary motion.

12

Ellis' requests, but have refused or delayed in producing them. While nothing described in Wilbur-Ellis's cross-motion rises to the level of sanctionable conduct, the Court will be mindful of plaintiffs' conduct during discovery proceedings in this matter. For now, it is sufficient to rule that plaintiffs have not satisfied the requirements for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction is **DENIED** and Wilbur-Ellis' motion for sanctions is **DENIED**.

**IT IS SO ORDERED.**

Dated: May 11, 2006

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE